## Gilbert et al. v. Pace.

(Decided December 15, 1931.)

WILLIAM LEWIS & SON and S. H. RICE for appellants.

ROSE & STAMPER for appellee.

JOHN M. BULL, Jr., Warning Order Attorney.

548

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Claiming title under and by virtue of a title bond purporting to have been executed by Abe Gilbert and wife to Farris Gilbert on June 25, 1909, and to have been assigned by Farris Gilbert to his wife, Mary Gilbert, now Mary Pace, on May 7, 1913, Mary Pace brought suit against Elizabeth Gilbert and others to recover certain lands in Owsley county. The defense was that the title bond was a forgery. After hearing the evidence, and comparing Farris Gilbert's signature on the bond with his handwriting on other instruments admitted to be genuine, the chancellor sustained the bond and rendered judgment in favor of Mary Pace. On appeal, the court, being in doubt, affirmed the judgment, Gilbert v. Pace, 222 Ky. 626, 1 S. W. (2d) 1048.

After the mandate was filed, Elizabeth Gilbert and others, defendants in the original action, filed their petition asking a new trial on the ground of newly discovered evidence of fraud in obtaining the judgment. After certain depositions had been suppressed, the case was heard in open court, and a new trial was denied. From that judgment, this appeal is prosecuted.

On the hearing, there was evidence by plaintiffs that they did not know, and had no means of knowing, of the newly discovered evidence at the time of the original trial. They then introduced as newly discovered witnesses Peter Riley, Edward Gross, Wash Daniel, and Jacob Carmack. Peter Riley testified in substance as follows: He was 26 years of age, lived at Buckhorn, in Perry county, and was engaged in farming. He was acquainted with the parties to the action. On one occasion he was present at the home of Jordan Gross while Mary Pace was there. Ed Gross was also present, and perhaps some children. While there he heard a conversation between Jordan Gross and Mary Pace. She said if she had the money she could win the land, and, if he would put it up, they could get the land and would divide it. She also said that it would take $50 down to get the papers fixed, and altogether it would take $200 she thought. They said they would write the bond "or something or 'nuther." They were both sitting at the table in the room and one of them was writing. He thought it was Mary Pace. He did not see the paper itself, but saw them writing it. He did not read the paper after it was written, and did not know what was stated in it. That

was about all he knew. He did not know who signed the bond. "They said something about they could get Buddy McIntosh to sign it and maybe John R. Sandlin, I think. They said they could get them or they would write their names to it or something like that." He could not say whether Jordan did any of the writing. He did not know whether he would be able to identify the paper or not. It was about 10 o'clock in the day, and 5 or 6 years ago. It was in the spring. He never read anything on the bond, nor did he hear it read. The bond being produced, he could not say it was the paper he saw them with. He never heard what they said. Neither Jordan nor Mary said in his presence what was in the paper. They were talking about a bond for land in Owsley county is what they said, to get back the land from Hacker. They were going to take the land by forging a bond. He did not see whose names were signed to it. They said they would get Buddy McIntosh, John R. Sandlin, and Willis Barker. After the paper was written, they took it before the fire and said they would smoke it and make it look old. Mary Pace did the writing with a pen or pencil, he did not recall which. Nothing was said at the time they took the paper to the fireplace. Mary Pace did not say what she took the bond to the fireplace for. He did not know whether she took it to the fireplace or not. "Seems like she said something about them smoking it to make it look old." He did not pay much attention to what they were doing. They never asked him to take any part in the transaction. He never saw Jordan pay over to Mary any money, or give her a check. He just came over to Jordan's house. It was about four miles from his house. He did not remember where he got with Ed Gross. He did not know where Ed lived, or what his occupation was. Ed now works. He went over to see Jordan, just to see him, drink some good liquor, and talk to him. He knew Anse Bowling and Robert Hacker and Gabe Hacker. He had not seen Anse often in the last 3 or 4 years. The first person he told of what he knew about the case was Anse Bowling at Anse's house. He was there squirrel hunting, and stayed all night. He had stayed all night with him several times. He also talked to Robert Hacker. He told Anse Bowling because Anse had bought some of the land, was a friend of his, and he thought Anse ought to know about it. He had stayed all night at Anse's house several times after he heard of the forgery, and did not

tell him about it. The reason he did not tell his friend was that he did not want to be in court. He took a notion to tell it because Ed Gross told it first. Being shown a piece of paper, he said that was about the size of the bond. He could not pick out of the bunch of papers a piece of paper like he saw them writing on. He could not tell the court exactly when it took place. He reckoned it was before December 23, 1927, when the suit was filed. He thought it was before, but was not certain about it at all. He did not know whether it was in the spring, or fall, that he was about Jordan Gross' home. He believed it was late in the spring, the first of summer, about April. He thought April was the first of summer. The witness was also asked about many other transactions, but was unable to remember the time and place.

Edward Gross' evidence is as follows: He was at the home of his brother Jordan, and Mary Pace was there. It was about 1922, he thought. They were talking about a bond for some land on Buffalo, and Mary said they were fixing up a bond to win some land on Buffalo, in Owsley. Mary said, if he would put up the money, they could win the land, and she could take half and give him half, he thought. She said it was the Abe Gilbert land. She said $200 would be necessary, and maybe more than that. Jordan said he would put up the money if she would give him a mortgage on some mules she had. They then went to writing. Besides Jordan and Mary, Peter Riley was there. This was at Jordan's house on Freeman's fork, in Perry county. He never read the bond they wrote, or heard it read. They said they would put John R. Sandlin's and Buddy McIntosh's name to it. Neither one of them was present. It took about 25 or 30 minutes to prepare the bond. Mary did the writing with an old-fashioned pen. He noticed it particularly. They did not ask him to take any part in it. He believed that was about all. Mary said they might have a suit, but, if they could get the paper fixed up, they could win the land. It was 9 or 10 in the morning, ''along in the spring like.'' The first person he told about the bond was Anse Bowling, after the Court of Appeals affirmed the judgment. He did not remember ''pime blank'' when that was. He told him in 1928. He was on Squabble creek at Buckhorn when he told him. He had known Anse Bowling since he was a boy, and they were pretty good friends. Anse asked him. He saw Mary Pace writing the bond at the

home of Malvery Gabbard. He did not know whether the bond exhibited to him was the same bond that he saw them with on that occasion. They were attempting to convey by bond Abe Gilbert's land. He meant to tell the court that Mary Pace wrote the bond, and said that she would sign the name of Abe Gilbert to it, and then transfer it. He never saw Anse Bowling many times before he told him about this. He had worked for Anse for a long time, but did not tell him about it until Anse came and asked him. Anse came over two or three times during February, 1928. It might not have been in February that he was over there. The best he could recollect it was about the 15th of the month of February, 1928. He was still working for Bowling. He was convicted of a felony about 17 years ago.

Wash Daniel testified that Mary Pace came to him about 2 or 3 years ago and wanted him to make a statement about a bond Farris had got from Abe. She said she would make him a good witness on his trial, and would swear to anything he wanted her to, if he would help her out with this, and he told her he did not see Farris with the bond. On cross-examination he stated that he had heard his daddy and others talk about the title bond as long as 12 or 14 years ago.

Jacob Carmack testified that he got with Mary Pace up at Jesse Dean's store. They were getting ready to take some depositions. She called him out of the store and asked him to swear to Farris Gilbert's handwriting. He told her that he would not swear to his writing; then she wanted him to get his brother to swear to it for her. He was then handed a paper marked Exhibit A and dated June 25, 19—, and he stated he thought that was the piece of paper Mary Pace handed to him, but he did not read it. He thought the one presented to him was written in ink. Mary said she would pay him to swear to it for her. He was not positive that she exhibited the piece of paper to him. The first person he told about it was John Campbell, Anse Bowling's father-in-law. He told him about it in 1928. It was at the time they were taking depositions at Jesse Dean's store, and it must have been in 1926. There was some other evidence about a forged deed, but this was fully developed on the former trial. Mary Pace was placed on the stand, and denied in toto the evidence given by the newly discovered witnesses.

It is the rule in this state that, to entitle a party to a new trial on the ground of newly discovered evidence, the evidence must be of so permanent and unerring a character as to preponderate greatly, or to have a decisive influence on the evidence to be overturned by it. Finley v. Tyler, 3 T. B. Mon. 400. Another statement of the rule is that newly discovered evidence, to warrant a new trial, must render a different result reasonably certain. Paducah Ice Co. v. H. E. Hall & Co. (Ky.) 113 S. W. 104; Maynard v. Boram, 180 Ky. 392, 202 S. W. 863. It is also the rule that a new trial for newly discovered evidence, which is merely cumulative or of an impeaching character, will not be granted. Ripperdan v. Scott, 1 A. K. Marsh. 151; Barrett v. Belshe, 4 Bibb 348; Hart Dry Cleaning Co. v. Grizzel, 218 Ky. 111; 290 S. W. 1057. All that Wash Daniel testified to was that about 2 or 3 years before that Mary Pace came to him and and wanted him to swear that he had seen the bond Farris got from Abe, and stated she would make him a good witness on his trial, and would swear to anything he wanted her to, if he would help her out with her suit. The substance of Jacob Carmack's evidence is that Mary Pace showed him the piece of paper, and wanted him to swear to Farris Gilbert's handwriting. Thereupon he told her he would not do so, and she wanted him to get his brother to swear to it for her. Not only was there evidence to the same effect on the former trial, but the purpose of the evidence was to discredit Mary Pace. In the circumstances, the evidence was merely cumulative and of an impeaching character; and therefore not such as to authorize a new trial.

Taking up the evidence of the witnesses Riley and Gross, we find that they testified to the alleged forgery of a bond some 5 or 6 years before they gave their evidence. They did not read the bond, or have it read to them. Neither was able to say that the bond of which they spoke was the bond involved in this action. On the contrary, there was strong evidence tending to show that the bond in question had been in existence for at least 12 or 14 years. If that be true, Jordan Gross and Mary Pace could not have been engaged in an effort to forge the bond. During the course of his examination, Riley said something about the bond being held before the fire, and then became uncertain as to this fact. When the bond in question was exhibited to him, he admitted that

it did not present a scorched appearance. Though both witnesses were friends of Anse Bowling, saw him on several occasions, and knew of the pending lawsuit, they did not tell him about the alleged forgery until after the case was first tried in the circuit court. Even the record of what these witnesses said does not impress us very favorably. Even if the transaction of which they speak took place, it does not show that the bond in question was forged. The chancellor, who was on the ground, heard the witnesses testify, observed their demeanor on the stand, and knew of the facts developed on the former hearing, was in a better position than we are to weigh their testimony. On the first trial, he based his opinion that the bond was not a forgery on a comparison of the writing on the bond with other writing of Farris Gilbert. After hearing the newly discovered evidence, he ruled that it was not of such a decisive character as to make a different result reasonably certain. On the contrary, he held in substance that, if the evidence in question had been before him on the first trial, it would not have affected the result. We are inclined to the same view. Instead of being of a permanent and unerring character, the evidence is either merely cumulative, or of an impeaching character, or so vague, uncertain, and unsatisfactory as not to require a new trial.

Judgment affirmed.